UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

232 DUNE ROAD, LLC,

                                    Plaintiff,                    **OPINION & ORDER**

        - against -                                                No. 20-CV-7721 (CS)

SCOTTSDALE INSURANCE COMPANY, ISU
JOHN C. CONKLIN AGENCY, GERARD K.
QUINN,

                                    Defendants.

-------------------------------------------------------------x

Appearances:
David Feureisen
Bartels & Feureisen LLP
White Plains, New York
*Counsel for Plaintiff*

Tracey K. Wishert
Michael V. Caracappa
Riker Danzig Scherer Hyland & Perretti LLP
Morristown, New Jersey
*Counsel for Defendant Scottdale Insurance Company*

Seth I. Weinstein
Lewis Brisbois Bisgaard & Smith LLP
New York, New York
*Counsel for Defendants ISU John C. Conklin Agency and Gerard K. Quinn*

Seibel, J.

        Before the Court are the motions for summary judgment of Defendant Scottsdale

Insurance Company ("Scottsdale"), (ECF No. 50), and Defendants ISU John C. Conklin Agency

and Gerard K. Quinn (collectively, "Conklin"), (ECF No. 48), and the cross-motion for summary

judgment of Plaintiff 232 Dune Road, LLC ("Plaintiff" or "Dune"), (ECF No. 62).  For the

following reasons, Scottsdale's motion is GRANTED, Conklin's motion is GRANTED, and

Plaintiff's cross-motion is DENIED.

I.      **BACKGROUND**

A.      **Facts**

The following facts are based on the parties' Local Civil Rule ("LR") 56.1 Statements, (ECF No. 55 ("Conklin 56.1 Stmt."); ECF No. 56 ("Scottsdale 56.1 Stmt."), ECF No. 67 ("P's 56.1 Scottsdale"); ECF No. 69 ("P's 56.1 Conklin"); ECF No. 76-1 ("Scottsdale 56.1 Resp.")), and the evidentiary materials submitted by the parties, and are undisputed unless otherwise noted.[1]

Dune is a New York limited liability company based in Mount Kisco and formed in 2019 as a single-purpose entity to acquire a vacant oceanfront property in Quogue, New York and build a luxury one-family home.  (P's 56.1 Scottsdale ¶ 1; ECF No. 4-1 ("Compl.") ¶ 9.) Michael Gaetano and his father, real estate developers and the sole members of Dune, have completed several real estate projects, including commercial and multi-family mixed-use

---

[1] Plaintiff filed a 56.1 Statement that it labeled as being both in response to Scottsdale's motion and in support of its cross-motion.  (P's 56.1 Scottsdale.)  It also filed a 56.1 Statement that it labeled as being in opposition to Conklin's motion.  (P's 56.1 Conklin.)  As Defendants point out, however, (ECF No. 76 ("Scottsdale Reply") at 3 n.2; ECF No. 60 ("Conklin Reply") at 3), Plaintiff did not comply with LR 56.1 in responding to Defendants' 56.1 Statements.  That Rule requires the party opposing summary judgment to include "correspondingly numbered paragraph[s] responding to each numbered paragraph in the statement of the moving party," LR 56.1(b), and to support each such paragraph with "citation to evidence that would be admissible," *id.* 56.1(d).  It further provides that if the non-moving party fails to specifically controvert a statement of the moving party, that statement is deemed admitted.  *Id.* 56.1(c). Plaintiff's failure to respond individually to Defendants' statements permits me to consider those statements admitted, provided Defendants' statements are properly supported by evidence.  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).  But that would not necessarily mean Defendants are entitled to summary judgment.  "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied *even if no opposing evidentiary matter is presented.*"  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (emphasis in original).  I do not know why Plaintiff's counsel chose the dangerous path of failing to submit proper LR 56.1 responses, which has made the Court's job unnecessarily difficult, but the Court nevertheless has, in its discretion, searched the record for evidence of factual disputes.  *See Sawyer v. Wight,* 196 F. Supp. 2d 220, 225 (E.D.N.Y. 2002).

residential buildings and a single-family luxury oceanfront home at 65 Dune Road.  (P's 56.1 Scottsdale ¶¶ 1-2.)

Prior to the project at issue, Conklin and one of its principals, Quinn, (*id.* ¶ 3), procured insurance for two of the Gaetanos' projects:  once in 2012 for two multi-family mixed use buildings in Manhattan and again in 2016 for the 65 Dune Road home, (ECF No. 63 ("Gaetano Decl.") ¶ 7; P's 56.1 Conklin ¶ 4).  Gaetano states in his declaration that he and his father had come to rely on Quinn "to provide expertise and advice on insurance coverage needed for our various projects," (Gaetano Decl. ¶ 6), but provides no facts to support that assertion.

In November 2019, Gaetano emailed Quinn informing him that they were in contract to purchase a vacant lot located at 232 Dune Road and requesting that Quinn procure "a policy to cover this piece of land."  (ECF No. 70-8 at 2; *see* P's 56.1 Conklin ¶ 5.)  Gaetano further wrote, "Since this is just vacant land at the moment the policy should reflect this at the time and change as construction progress is made?"  (ECF No. 70-8 at 1.)  When asked at his deposition whether he made any specific request for coverage, Gaetano testified that "[t]he only request was for it to be a homeowner, builder risk policy with the type of structure being built.  And for a replacement value.  And for the . . . coverages included in a builders risk policy."  (ECF No. 70-1 ("Gaetano Depo.") at 47:4-13.)

On February 3, 2020, Quinn wrote to another Conklin employee, indicating that he had spoken to Gaetano on the phone:

> They will be breaking ground in early March.  Mike asked if we are able to get a homeowners policy, based on the fact they expect to occupy the house when completed. . . .  We will need a home insurance policy, preferably in the name of the LCC . . . .  We will also need a minimum premium [workers' compensation] policy. . . .  Everything will be subcontracted out with Certificates of Insurance

(COI) being provided by the subcontractors with the LLC included as an
Additional Insured.

(ECF No. 70-17.)[2]

Johnson & Johnson, Inc. ("J&J") is Scottsdale's "managing general agent."

(Scottsdale 56.1 Stmt. ¶ 2.)  A "JJ Select High Value Home Quote Sheet" for 232 Dune

Road, created on or before February 6, 2020 on J&J letterhead, provides details about the

project and requests a Builders Risk policy, (ECF No. 70-22), although the record is

frustratingly unclear as to who filled out the quote sheet, when and based on what source

of information.  As best as the Court can tell, the information on the form came from

Conklin.  (*See* Quinn Depo. at 18:4-16; ECF No. 70-6 ("McDonald Depo.") at 89:11-

92:7.)

On February 7, 2020, Quinn emailed Plaintiff:

Please review the attached in reference to the captioned and let us know if you
have any questions at all.  In accordance with your request, we have included
$3,300,000 for the dwelling with a $10,000 property loss deductible, other than
windstorm/hail claims for which there is a 2% deductible ($66,000).  There is also
$500,000 of liability coverage and $5,000 for Medical Payments to Others
included.

(ECF No. 70-16 at DUNE0000095-96.)[3]  On February 13, 2020, Gaetano wrote, "232

Dune Road LLC the homeowner G[eneral] C[ontractor] for this project is also required to

---

[2] Quinn testified that he initially understood that the house would be for the Gaetano
family, (ECF No. 70-2 ("Quinn Depo.") at 15:9-16:4; *see id.* at 73:9-13), but he apparently
learned otherwise at some unspecified time.  Gaetano testified that there was never any plan for
his family to occupy 232 Dune and that he never discussed that possibility with Quinn.  (Gaetano
Depo. at 179:13-23.)

[3] The subject of the email is "232 Dune – Insurance Proposal," (ECF No. 70-16 at
DUNE0000095), but no party has provided a copy of the attachment.  The "JJ Select High Value
Home Quote Sheet" listed the amount of liability coverage sought as $1 million, (ECF No. 70-22
at J&J000027, J&J000029), but Quinn's February 7, 2020 email refers to $500,000 in liability
coverage, (ECF No. 70-16 at DUNE0000095-96), and that is the amount ultimately requested,

have Workers Comp by the Village of Quogue.  We won't have employees and all subs

will have us as additionally insured for G[eneral] L[iability] and W[orkers']

C[ompensation]." (*Id.* at DUNE0000094.)  On February 18, 2020, Gaetano reiterated

that "[w]e are the [general contractor] so everything with subs will be an [American

Institute of Architects] contract requiring them to have us as additionally insured.  Steve

and I don't have any employees but still need to have a [workers' compensation] policy

in place to get permits.  It's a requirement of the Village of Quogue." (ECF No. 70-19 at

DUNE0000099.)  On February 26, 2020, at Gaetano's request, Conklin re-sent its

February 7 email regarding the proposal.  (*Id.* at DUNE00000111-12.)

On February 27, 2020, J&J issued a New Business Insurance Quote and, under

the "Rating Factors and Underwriting Information" section, the policy form field read

"HO3" and the occupancy field read "Builders Risk (Ground Up Construction)." (ECF

No. 49-15 at J&J000095.)  An HO3 policy form is a type of "standard form for insurance

coverage used in the insurance industry" generated by the Insurance Services Office, Inc.

("ISO"). (Quinn Depo. at 79:16-18; *see id.* at 79:11-80:3, 84:18-85:1; McDonald Depo.

at 73:4-9 ("HO3 Policy Form is a standard insurance form that's used industry-wide" and

available on the internet).)  Matt McDonald, the underwriter for J&J who underwrote the

policy for Plaintiff on behalf of J&J, testified that the HO3 policy designation in the

insurance quote "indicate[d] that the standard HO3 Form was intended to be the main

coverage form for the Scottsdale policy that was being purchased." (McDonald Depo. at

77:2-20.)

---

(ECF No. 70-23 at DUNE000032), and bound, (ECF No. 49-17 at J&J000174).  The record is
unclear as to how the liability coverage amount was changed, but the issue is not material to the
motions.

On March 2, 2020, Quinn asked Gaetano to "remind [him] where we are with the Builder's Risk insurance," to which Gaetano responded, "BR policy looks good. Can we please put it in place." (ECF No. 70-19 at DUNE0000115-16.) On March 3, 2020, Gaetano received and signed a Homeowner Application, which was dated February 6, 2020 and listed February 6, 2020 to February 6, 2021 as the effective dates of the policy. The application also listed "HO3" in the "HO Form" field of the "Coverages/Limits of Liability" section of the application. (ECF No. 70-23 at DUNE0000032; P's 56.1 Scottsdale ¶ 13.) Conklin understood that, through this designation, Plaintiff was applying for an HO3 policy for 232 Dune Road, (Quinn Depo. at 74:19-76:9), but Gaetano states in his declaration that Quinn "never explained to me in any way what the 'HO3' entry meant," and that nobody from Quinn's office ever reviewed the application with him, (Gaetano Decl. ¶ 15). Nevertheless, Gaetano testified that Conklin had authority to act on Dune's behalf in binding the coverage that was proposed in the Scottsdale quote, which mirrored the Homeowner's Application,[4] and that Quinn was "my agent acting in my best interest." (*See* Gaetano Depo. at 171:17-172:2.) Also on March 3, 2020, Gaetano signed a "Builders Risk Supplemental Questionnaire," (ECF No. 70-20,) and on March 4, J&J issued a binder, which indicated that the policy form was an "HO3" and that the occupancy type was "Builders Risk (Ground Up Construction)," (ECF No. 49-17 at J&J000174; P's 56.1 Scottsdale ¶ 17).

---

[4] The Homeowner's Application signed by Gaetano was pre-filled by J&J's system with information previously provided by Conklin, after which it was sent to Conklin for review, signed by Gaetano and returned to J&J. (*See* McDonald Depo. at 84:21-86:12, 89:11-92:7; Gaetano Depo. at 62:6-63:4, 139:8-12; Quinn Depo. at 25:10-13.)

On March 26, 2020, Gaetano received from Conklin a copy of the policy issued by Scottsdale (the "Policy"), (P's 56.1 Scottsdale ¶ 18; Gaetano Decl. ¶¶ 18-19), a 44-page document bearing policy number HOS1279122 and covering the period "03/05/2020 to 03/05/2021," (ECF No. 70-7 ("Policy")).  It did not contain the HO3 form, (*see id.*), or list the HO3 form on the "Schedule for Forms and Endorsements," (*id.* at J&J000532), but it did contain several references to "HO3."  First, on each of the declarations pages – the first two pages of the Policy – the policy form is listed as "HO3." (*Id.* at J&J000529-30.)  Second, on several of the endorsements, the text at the top of the page stated that the endorsement modified the "Homeowners 3 – Special Form."  (*Id.* at J&J000536, J&J000539, J&J000546, J&J000548-49, J&J000551.)  Without the HO3 form, the Policy neither explained its coverage nor set forth its exclusions (other than to the extent the endorsements modified what would have been covered or excluded by the HO3 form).  According to both Plaintiff and Quinn, Quinn did not review or explain the coverage set forth in the Policy to Gaetano.  (Gaetano Decl. ¶ 18; Quinn Depo. at 38:2-7.) The declarations pages each specified "Builders Risk (Ground Up Construction)," (Policy at J&J000530-31), and the Endorsements included one for "Builders Risk Liability Coverage," (*id.* at J&J000549).

After the concrete foundation for the project was installed, testing revealed that the concrete used could not hold the load required to support the structure under the applicable building codes.  (Gaetano Decl. ¶ 21.)  On July 28, 2020, Gaetano notified Quinn of the concrete failure and requested that he file a claim for the loss.  (*Id.* ¶ 23.) Quinn responded that it "[a]ppears to be negligence on both the concrete supplier and concrete contractor" and that he would reach out to the "Builder's Risk insurance

company claims department" and get back to him.  (ECF No 70-10 at DUNE0000129-30.)  Accordingly, Conklin filed a property loss notice and listed the description as "defective concrete so the job has been shut down.  Concrete supplier nor contractor is not taking responsibility."  (ECF No. 70-11 at DUNE0000072.)  When Gaetano asked whether if Dune was covered for this claim, Quinn replied:

> I have not reviewed the policy form yet, which I will do this morning.  We wanted to get the wheels in motion reporting the loss/claim to the General Agent and Scottsdale.  We are hopeful it is a covered claim, less your deductible and would expect S[c]ottsdale to seek full recovery, including your deductible, through Subrogation.

(ECF No 70-10 at DUNE0000128.)

On July 29, Scottsdale informed Gaetano that the Policy did not cover the defective concrete claim, referencing "Special Form – Section I – Exclusions – Section B, Number 3," (ECF No. 70-12 at DUNE0000050), which excluded claims for "[f]aulty, inadequate, or defective . . . workmanship . . . construction . . . [or] [m]aterials used in repair, construction, renovation or remodeling," (ECF No. 49-32 at SIC000382.)  Gaetano forwarded this email to Quinn, who reviewed the policy and responded that he was unable to locate the cited section. (ECF No. 70-12 at DUNE0000049.)  Quinn also noted that the "Scottsdale/Nationwide adjuster has a different copy of the [P]olicy for some reason."  (*Id.*)[5]  On July 30, Gaetano informed Scottsdale that he was unable to locate the relevant section in his version of the Policy.  (ECF No. 70-14.)  The Scottsdale agent responded, "I have researched with our general agent and the policy form was not sent to you.  I have spoken with your agent and explained this as well.  They will have the policy mailed out to you accordingly. . . . Unfortunately, the policy does not

---

[5] Scottsdale is a subsidiary of Nationwide Mutual Insurance Company ("Nationwide"). (ECF No. 70-4 ("Gillis Depo.") at 17:21-18:2.)

provide coverage for this." (*Id.*)  According to Scottsdale, the HO3 policy form, in full, was inadvertently omitted from the documents sent to Gaetano and Quinn due to a printing error. (McDonald Depo. at 66:20-67:19, 72:16-75:8; ECF No. 70-24 at SIC000222; *see* ECF No. 49-32 at SIC000395; ECF No. 70-27 at J&J000648-49.).  A Scottsdale representative wrote that she had explained to Quinn that the HO3 policy form had not been included in the documents sent to him and Plaintiff, and that J&J would "add this back in to the inception date of the policy." (ECF No. 70-13 at J&J000649.)  She added that "this doesn't change coverage on our side as the policy was written as an HO3 which excludes faulty/defective material/workmanship, etc." (*Id.*) The Policy was re-issued with the same policy number and effective dates, but now including the HO3 form.  (Conklin 56.1 Stmt. ¶ 32; *see* ECF No. 49-32.).  The HO3 form set forth both the coverage, (ECF No. 49-32 at SIC000372-81), and the exclusions, (*id.* at SIC000381-82), including the exclusion for "[f]aulty, inadequate or defective . . . workmanship . . . construction . . . [or] [m]aterials used in repair, construction, renovation or remodeling," (*id.* at SIC000382).

According to Quinn, when the request to bind the Policy was submitted, it was Conklin's understanding that the exclusion contained in the HO3 for faulty work and defective materials would be included in the Policy.  (Quinn Depo. at 104:3-9.)  Quinn testified that he did not advise Gaetano on what an HO3 policy was because Gaetano already had an HO3 policy on his house.  (*Id.* at 26:20-27:2.)  He added that Gaetano did not ask about whether the homeowner's policy would cover claims for faulty work performed by contractors or defective materials used by subcontractors in the construction of the home.  (*Id.* at 73:14-22.)  Gaetano states that he did not know what "HO3" meant, (Gaetano Decl. ¶ 15), and that he "fully expected that a claim resulting from the work of one of my subcontractors would be covered, as an owner and General Contractor," (*id.* ¶ 16), but he does not point to anything Quinn or Conklin said that gave him

that expectation, or otherwise explain its genesis, except to say that he had previous builders risk policies, although not homeowners builders risk policies, that covered items like defective materials, (Gaetano Depo. at 119:23-122:4; 131:24-136:5).

**B.    Procedural History**

On August 19, 2020, Plaintiff brought this action in the Supreme Court of the State of New York, Westchester County, against Scottsdale, Conklin, and Quinn.  (Compl.)  The Complaint sets forth claims against Scottsdale for breach of contract and violation of the covenant of good faith and fair dealing, and seeks a declaratory judgment that Scottsdale is obligated to perform on its contractual obligations to Plaintiff under the Policy and that Plaintiff is entitled to coverage under the Policy for the full amount of the loss.  (*Id.* ¶¶ 31-50.)  It set forth claims against Conklin and Quinn for breach of contract, negligence, and professional malpractice.  (*Id.* ¶¶ 51-70.)

On September 21, 2020, Defendants Conklin and Quinn removed the action to this Court based on diversity jurisdiction.  (ECF No. 4.)  On October 12, 2020, Conklin and Quinn answered the Complaint, (ECF No. 12), and October 13, 2020, Scottsdale answered the Complaint and filed a counterclaim, seeking reformation of the Policy to include the HO3 form, (ECF No. 15).  The parties undertook discovery, and the instant motions followed.

**II.    LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).[6]

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."  *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address

---

[6] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

III.  **DISCUSSION**

A.  **Claims Against Scottsdale**

Plaintiff asserts claims for breach of contract and violation of the covenant of good faith and fair dealing against Scottsdale, (Compl. ¶¶ 35-50), and seeks a declaratory judgment stating that Scottsdale is obligated to perform on its contractual obligations to Plaintiff under the Policy and that Plaintiff is entitled to coverage under the Policy for the full amount of the loss, (*id.* ¶¶ 31-34).

1.  **Insurance Contract Principles**

It is well-settled that "interpretation of an insurance agreement is a question of law," *High Point Design, LLC v. LM Ins. Corp.*, 911 F.3d 89, 93 (2d Cir. 2018), as is the question of whether an insurance provision is clear or ambiguous, *VAM Check Cashing Corp. v. Fed. Ins. Co.*, 699 F.3d 727, 729 (2d Cir. 2012); *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 201 (2d Cir. 2010).  Under New York law, "[t]he court must interpret the contract to give effect to the intent of the parties as expressed in the clear language of the contract," *Intelligent Digit. Sys., LLC v. Beazley Ins. Co.*, 716 F. App'x 1, 3 (2d Cir. 2017) (summary order), and insurance policies are interpreted according to principles of contract law, "giving policy language its plain and ordinary meaning," *Zurich Am. Ins. Co. v. Liberty Mut. Ins. Co.*, 710 F. App'x 3, 6 (2d Cir. 2017) (summary order); *see Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 98-99 (2d Cir. 2012) ("Under New York law, insurance policies are interpreted

according to general rules of contract interpretation. . . . [T]he words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.").  "An ambiguity exists where the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Off. Sol. Grp., LLC v. Nat'l Fire Ins. Co. of Hartford*, 544 F. Supp. 3d 405, 413 (S.D.N.Y. 2021) (quoting *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000)).

   "It is well established under New York law that a policyholder bears the burden of showing that the insurance contract covers the loss."  *Bianchi v. Florists' Mut. Ins. Co.*, 422 F. App'x 56, 58 (2d Cir. 2011).  The burden then shifts to the insurer to prove that a coverage exclusion applies.  *Beazley Ins. Co. v. ACE Am. Ins. Co.*, 880 F.3d 64, 68 (2d Cir. 2018).  In New York, "[t]he law governing the interpretation of exclusionary clauses in insurance policies is highly favorable to insureds," and "[p]olicy exclusions are enforced only when they have a definite and precise meaning, unattended by danger of misconception and concerning which there is no reasonable basis for a difference of opinion."  *Id.* at 68-69; *see Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) ("[T]o negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that could fairly be placed thereon.").

2.      **Breach of Contract**

Scottsdale moves for summary judgment on the breach of contract claim on the grounds that the HO3 form is incorporated into the Policy by reference, (ECF No. 51 ("Scottsdale Mem.") at 11-14), that it clearly excludes coverage for Plaintiff's loss, (*id.* at 15-16), and that Plaintiff cannot selectively enforce the HO3 form by claiming to be covered under it but not bound by its exclusions, (*id.* at 14-16).  Plaintiff cross-moves for summary judgment on the breach of contract claim, arguing that the HO3 form cannot be incorporated by reference, (ECF No. 66 ("P's Scottsdale Opp.") at 11-14), and Plaintiff can enforce the Policy without inclusion of the HO3 form, (*id.* at 14-17).

a.      Incorporation by Reference

"To determine whether a contract has incorporated a document by reference, courts look to whether a reasonable person would understand the specific document to be incorporated by reference, in other words, an objective standard."  *Miller v. Mercuria Energy Trading, Inc.*, 291 F. Supp. 3d 509, 517 (S.D.N.Y. 2018), *aff'd*, 774 F. App'x 714 (2d Cir. 2019) (summary order). Courts consider two factors in making this determination:

> (1) whether the allegedly incorporated document is expressly identified and so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt; and (2) whether the language incorporating the document clearly communicates that the purpose of the reference is to incorporate the referenced material into the contract.

*Id.*

In support of its argument that the HO3 form was incorporated into the Policy by reference, Scottsdale cites two New York state cases.  (Scottsdale Mem. at 11-13.)  The first, *Hirshfeld v. Maryland Casualty Co.*, arose out of defendant insurance company's issuance of a homeowners insurance policy that excluded coverage for water damage.  671 N.Y.S.2d 100, 101 (App. Div. 1998).  Although the declarations page and supplemental declarations page of the

policy referred to a water backup endorsement – which provided coverage for such damages limited to $3500 – the policy that plaintiffs received did not include the endorsement with the coverage limitation.  *Id.*  Plaintiffs argued that the insurance company should indemnify their full $16,695.50 water damage claim pursuant to the water backup endorsement because the declarations pages did not contain any indication of the $3500 limitation.  *Id.*  The Second Department rejected plaintiffs' argument, holding that, "[a]s indicated in the supplemental declarations page, the water backup endorsement was made a part of the policy and was thereby incorporated by reference regardless of whether the plaintiffs received actual delivery of the endorsement."  *Id.*  The Court added "plaintiffs cannot seek the benefit of the coverage provided by the endorsement without being subject to the limitations of that coverage."  *Id.*  Similarly, in *Ruiz v. State Wide Insulation & Construction Corp.*, the court found that an undelivered endorsement referenced on the declarations page was incorporated by reference into the insurance policy.  703 N.Y.S.2d 257, 258 (App. Div. 2000).  The court held that "[t]he declarations page and the accompanying endorsements were made part of the insurance policy and were incorporated by reference into the policy regardless of whether the insured received actual delivery thereof."  *Id.* at 259.

Without addressing *Ruiz*, Plaintiff argues that *Hirshfeld* is inapposite because the policy in that case explicitly referenced the endorsement and here, the Policy that was delivered to Plaintiff did not mention the "defective materials exclusion."  (P's Scottsdale Opp. at 13.)  But this misrepresents Scottsdale's argument, which is that the HO3 form in its entirety – not the defective materials exclusion alone – was incorporated by reference.  In *Hirshfeld*, the water backup endorsement – containing both the coverage and the limitation – was the entirety of the document to be incorporated and it was clearly identified on the declarations page.  Likewise

here, the exclusion at issue is part of a larger policy form containing both coverage and exclusions. Accordingly, if the HO3 form was incorporated into the Policy by reference, the relevant exclusion for defective workmanship and materials contained within the form would also be incorporated.

As described above, under the incorporation by reference doctrine, I must consider two factors. As to the first factor – whether the document is expressly identified and referred to in the instrument – the HO3 form was expressly and clearly identified in the Policy beyond all reasonable doubt. The evidence overwhelmingly demonstrates that there is only one "HO3 form" and that it is a standard form created by the ISO and used in the insurance industry. Kevin Brown, an underwriter at Scottsdale, testified that a reference to "HO3" refers to the "Homeowners 3 Special Form," (ECF No. 70-5 ("Brown Depo.") at 41:13-21), and that the defective materials exclusion is a "standard exclusion contained in the HO3 policy form," (*id.* at 42:7-21). When asked whether there were any other policy forms to which the HO3 designation could refer, Brown testified, "No, there is only one HO3 policy form." (*Id.* at 44:17-20.) McDonald testified that despite the fact the HO3 form was not included in the Policy, Quinn "could have searched for an HO3 Policy Form online. HO3 Policy Form is a standard insurance form that's used industry-wide. It's the same thing across the board. So if he really wanted to find the HO3 policy form, he could have Googled it." (McDonald Depo. at 73:4-9.) Jonathan Duncan Gillis, a claims manager at Nationwide, testified that the reference to "HO3" on the first page of the Policy identifies "an HO3 policy form." (Gillis Depo. at 61:10-24.) Indeed, the form itself bears at the bottom of each page a notation that it was copyrighted by ISO in 2010. (ECF No. 49-32 at SIC000370-93.)

16

Nor does Quinn's testimony introduce any reasonable doubt.  He originally mistook a four-page endorsement modifying the HO3 form to be a different version of the HO3 form, but corrected himself.[7]  He testified that he recognized the HO3 form to be a standard form for coverage issued by ISO and used in the insurance industry, (Quinn Depo. at 79:11-80:3), and understood the "HO3" designation to mean that Scottsdale was issuing an HO3 policy, (*id.* at 74:19-75:3).  No reasonable jury could conclude that "HO3" referred to anything other than the standard form.

As to the second factor – whether the language clearly communicates that the purpose of the reference is to incorporate the referenced material – the references to the HO3 form clearly are intended to represent that Plaintiff's type of homeowners insurance policy is an HO3, in light of the fact that it is identified in the Declarations on the first pages of the Policy as Plaintiff's "policy form," and many of the endorsements specify that they are modifying the Homeowners 3 form.  This conclusion is supported by the record.  Brown testified that "the box that indicates

---

[7] When asked whether it was "Conklin's understanding that the [P]olicy would be written on the main coverage form, Homeowners 3 Special Form" in light of the HO3 form reference, Quinn responded:

> Not necessarily so.  This could be programmed business where the managing general agent issues builder's risk in conjunction with the HO 3 form.  But I think when you go to the schedule of forms, I don't think it indicates which HO3 form was being included.  If you go down to the next page, schedule of endorsements and things of that nature.  So it's a little bit different than a standard, you know, homeowners policy for a regular company.

(Quinn Depo. at 83:14-84:9.)  When asked whether there were different versions of the HO3 form, Quinn responded, "Apparently so.  They are updated, you know; so you have to look at the edition date."  (*Id.* at 85:5-8.)  Quinn initially seemed to believe that the original Policy included a unique, four-page HO3 form, (*id.* at 56:16-18), which is not so, and he apparently realized later in his testimony that he had misread the title of an endorsement that modified coverage under an HO3 policy, (*id.* at 91:1-96:6).  Quinn ultimately concurred that "HO 3 references a standard ISO insurance form," (*id.* at 84:21-85:1), that the HO3 form was the main coverage form for the policy, (*id.* at 75:23-76:9, 92:23-93:2, 99:13-15), and that it was intended to be in the Scottsdale policy, (*id.* at 100:16-101:14).

the HO form" indicates that "the insured is requesting the HO3 as the main coverage form."

(Brown Depo. at 40:5-18.)  Monique Moore, Scottsdale's claim representative, testified:

> [O]n the deck [declarations] page, the policy form says HO3.  On the application
> for which the policy was submitted to be written as, was also an HO3.  On the
> other forms and endorsements like for example, the wind and hill, deductible
> form, personal property forms, they all reference the HO3 that it is endorsing or
> changing.  So based on that – that is the main policy form.  You can't have other
> endorsements without a main policy form.  So being that it's on the deck, on the
> application . . . that is the intent.

(ECF No. 70-3 ("Moore Depo") at 61:6-17.)  McDonald similarly testified that the

reference to "HO3" indicated that the "HO3 Form was intended to be the main coverage

form for the Scottsdale policy that was being purchased."  (McDonald Depo. at 77:9-15.)

Quinn concurred.  (Quinn Depo. at 75:23-76:9, 92:23-93:2, 99:13-15.)  There is no other

rational explanation for what the references to "HO3" and "Homeowners 3 – Special

Form" could mean or what purpose they could serve, other than to incorporate the HO3

form as the main coverage document in the Policy.

In light of the evidence presented, I find as a matter of law that no rational juror –

let alone a reasonably intelligent person "cognizant of the customs, practices, usages and

terminology as generally understood in the particular trade or business," *Off. Sol. Grp.,*

*LLC*, 544 F. Supp. 3d at 413 – could reach any conclusion other than that the reference to

"HO3" in the Policy unambiguously incorporates the HO3 form by reference.

In opposition, Plaintiff relies on *Sterner v. Balcom*, 531 N.Y.S.2d 211 (Sup Ct. 1988),

*aff'd sub nom. Sterner v. Colonial Co-op. Ins. Co.*, 549 N.Y.S.2d 537 (App Div 1989), to

support its argument that "Scottsdale cannot rely on an exclusion which was not listed on the

Declaration Page or Endorsements," (P's Scottsdale Opp. at 12).  In *Sterner*, the court held that a

reference to "ML 20" on the face of a policy was insufficient to put the insured on notice that the

corresponding endorsement was incorporated by reference. *Sterner*, 531 N.Y.S.2d at 212. The

court concluded that the reference to ML 20:

> in no way tells this insured that there is an exclusion for business activities. This
> form would have to be attached to enable a layman to understand (after reading
> the policy and attachments,) that he was not covered for business activities. To
> require a layman to be bound by every cryptic code letter or number set forth in a
> complicated policy places an extremely heavy burden on that layman.
> Supplementary provisions or riders should be attached to a policy in order to
> remove any doubt as to the intention of the parties.

*Id.* Unlike *Sterner*, however, the evidence in this case demonstrates that the "HO3" designation

is not a "cryptic code letter" but rather a standard form used often in the insurance business.

Additionally, the reference was not to a "supplementary provision[] or rider[]" but to the policy

form itself, and was made clear by being listed in the policy form field. (Policy at J&J000530.)

Further, not only was HO3 specified as the "policy form" on the front pages of the document,[8] it

was repeatedly referenced throughout the 44-page policy. This case is closer to the more recent

Appellate Division cases, *Hirshfeld*, 671 N.Y.S.2d at 101, and *Ruiz*, 703 N.Y.S.2d at 259, in each

of which an undelivered document was nevertheless incorporated.

### b.     Enforcement of the HO3 Form

Plaintiff properly does not dispute that the exclusion in the HO3 form for "[f]aulty,

inadequate or defective" workmanship, construction and materials, if applicable, would bar its

claim here. *See Laquila Const., Inc. v. Travelers Indem. Co. of Ill.*, 66 F. Supp. 2d 543, 545

(S.D.N.Y. 1999) (claim for defective concrete was barred under exclusion for faulty or defective

material or workmanship), *aff'd*, 216 F.3d 1072 (2d Cir. 2000). And I have already found that

---

[8] Plaintiff's contention that "[n]owhere on the Declarations page or the List of
Endorsements page did the Policy reference the HO3 Special form," (P's Scottsdale Opp. at 7), is
simply false. The Declarations pages each say, "Policy Form:  HO3," (Policy at J&J000529,
J&J000530), in addition to the references to "Homeowners 3 – Special Form" on numerous of
the endorsement pages, (*id.* at J&J000536, J&J000539, J&J000546, J&J000548-49, J&J000551).

the entire HO3 form, with both its coverage provisions and exclusions, governs.  But Plaintiff

argues that the Policy provides coverage on its own, without the need to rely on the HO3 form,

and thus without the ability for Scottsdale to rely on the exclusion.  (P's Scottsdale Opp. at 14-

17.)  In support of this claim, Plaintiff submits the expert report of Richard G. Pfluger.  (*See* ECF

No. 70-26 ("Pfluger Rep.").)[9]

As Scottsdale argues, the Court cannot consider Pfluger's report because Plaintiff

"violated Rule 26 and the Court's June 7, 2021 Schedule Order (ECF No. 28) by disclosing its

expert for the first time in its opposition to summary judgment."  (Scottsdale Reply at 11 n.3.)

Federal Rule of Civil Procedure 37(c)(1) provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or
> (e), the party is not allowed to use that information or witness to supply evidence on a
> motion, at a hearing, or at a trial, unless the failure was substantially justified or is
> harmless.

"The purpose of the rule is to prevent the practice of 'sandbagging' an opposing party with new

evidence."  *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004).  "In considering

whether to exclude evidence under this standard, courts refer to a nonexclusive list of four

factors:  (1) the party's explanation for its failure to disclose, (2) the importance of the evidence,

(3) the prejudice suffered by the opposing party, and (4) the possibility of a continuance."

*Agence Fr. Presse v. Morel*, 293 F.R.D. 682, 685 (S.D.N.Y. 2013); *see Patterson v. Balsamico*,

440 F.3d 104, 117 (2d Cir. 2006).

Plaintiff's only explanation for its failure to disclose Pfluger's report in discovery is that

after the close of discovery, it reached an agreement with Conklin that each could provide

belated expert reports.  (ECF No. 74 ("P's Reply") at 8 n.2.)  Plaintiff nowhere suggests that

---

[9] Citations to the Pfluger Rep. refer to page numbers set by the Court's Electronic Case
Filing ("ECF") system.

Scottsdale or the Court were part of that agreement.  The evidence, while ultimately

unpersuasive as discussed below, is important, as Plaintiff relies heavily on it; the prejudice to

Scottsdale is obvious, in that it had no opportunity to depose the expert or obtain a rebuttal, *see*

*Doctor's Assocs., Inc. v. QIP Holder LLC*, No. 06-CV-1710, 2010 WL 669870, at *13 (D. Conn.

Feb. 19, 2010) ("The Defendants moved for summary judgment with the belief that the full

factual record of the case was developed.  Imposing new discovery burdens on the Defendants

for the purpose of allowing them to challenge the information contained in the Steckel Affidavit

at this late juncture would cause them significant prejudice."), and it would be inefficient and

unfair to put aside this motion and reopen discovery in this already long-pending case, *Gotlin v.*

*Lederman*, No. 04-CV-3736, 2009 WL 2843380, at *5 (E.D.N.Y. Sept. 1, 2009) (precluding

belated production of medical records in part because "Court would be constrained to reopen

expert discovery, thereby further prolonging this five-year-old case and imposing significant

additional litigation costs on defendants").  Plaintiff's late disclosure is classic sandbagging that

justifies disregarding Pfluger's report in connection with Scottsdale's motion.

      Even if I were to consider it, it would not change the outcome.  In his report, Pfluger

asserts that Plaintiff purchased an "'all risk' homeowners/builders risk policy" that "provides

coverage for any loss, unless it is specifically excluded in the policy."  (Pfluger Rep. at 6.)  He

does not explain how one can know that a policy is "all risk" without referring to the coverage

form.[10]  Defendant does not dispute that HO3 form provides all-risk coverage, but it also

includes exclusions.  Pfluger goes on to state that "[t]he 'all risk' Policy sold to 232 Dune under

its terms covers the claim in issue here."  (*Id.* at 7.)  Tellingly, he specifies no "term" in the 44-

---

[10] Indeed, the first words in the HO3 form are, "We will provide the insurance described
in this policy . . . ."  (ECF No. 49-32 at SIC0000370.)

page policy that provides such coverage.  Without reference to the HO3 form, Pfluger does not

point to any provision in the Policy that covers the damages in this case.  His opinion is classic

impermissible *ipse dixit.  See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  It is otherwise

undisputed that the HO3 form provides the coverage.  (*See* Quinn Depo. at 99:7-15 ("[T]here has

to be a main coverage form" that the endorsements included in the Policy modify); McDonald

Depo. at 83:11-12 (the "HO3 Form provides coverage and it also excludes coverage"); Brown

Depo. at 51:14-19 (HO3 form is main coverage form for policy and without it, "there is no

coverage"); *id.* at 46:7-13 (endorsements in the Policy modify the HO3 coverage form).)

It is Plaintiff's burden to show that the Policy covers the loss here.  *MBIA Inc. v. Fed. Ins.

Co.*, 652 F.3d 152, 158 (2d Cir. 2011) ("[T]he insured bears the burden of showing that an

insurance coverage covers the loss.").  "Labeling the policy as 'all risk' does not relieve the

insured of its initial burden of demonstrating a covered loss under the terms of the policy."

*Roundabout Theatre Co. v. Cont'l Cas. Co.*, 751 N.Y.S.2d 4, 7 (App Div. 2002).  Plaintiff has

failed to present any evidence, beyond Pfluger's report – which does not address any actual

language of the Policy – that the defective material claim at issue is covered without the HO3

form, and the undisputed facts show otherwise.

Under New York law, plaintiffs cannot seek the benefit of insurance coverage without

being subject to the limitations of that coverage.  *Hirshfeld*, 671 N.Y.S.2d at 101 (1998); *see

Weiss v. La Suisse*, 154 F. Supp. 2d 734, 738 (S.D.N.Y. 2001) ("It is also a maxim of New York

law that a plaintiff cannot seek the benefit of insurance coverage without being subject to the

limitations of that coverage. . . .  Live by the sword, die by the sword.")  That means, as

Scottsdale contends, (Scottsdale Mem. at 15), that Plaintiff may not rely on the coverage in the

HO3 form without also being subject to the defective materials exclusion in that form.  Because

the HO3 form is incorporated by reference, because without it there is no coverage, and because

with it the damages here are excluded, Plaintiff's breach of contract claim against Scottsdale

fails.

### 3. Good Faith and Fair Dealing

Scottsdale also moves for summary judgment on the good faith and fair dealing claim on

the grounds that it is duplicative of Plaintiff's breach of contract claim, (Scottsdale Mem. at 18-

20), and there are no facts to support bad faith, (*id.* at 20-21).  In opposition, Plaintiff argues that

there are fact issues because Scottsdale and J&J "backdated" the Policy to add the HO3 form and

the two claims address different conduct.  (P's Scottsdale Opp. at 20.)

"Implicit in every contract is an implied covenant of good faith and fair dealing."  *25 Bay*

*Terrace Assocs., L.P. v Pub. Serv. Mut. Ins. Co.*, 148 N.Y.S.3d 484, 489-90 (App. Div. 2021).

"The implied covenant of good faith and fair dealing is a pledge that neither party to the contract

shall do anything which will have the effect of destroying or injuring the right of the other party

to receive the fruit of the contract, even if the terms of the contract do not explicitly prohibit such

conduct."  *Gutierrez v. Gov't Emps. Ins. Co.*, 25 N.Y.S.3d 625, 627 (App. Div. 2016).

> In the context of an insurance-related dispute, the implied covenant of good faith and fair
> dealing means that the insurer must investigate claims for coverage in good faith, must
> not manufacture factually incorrect reasons to deny insurance coverage, must not deviate
> from its own practices or from industry practices, and must not act with gross disregard
> of the insured's interests."

*E. Ramapo Cent. Sch. Dist. v. N.Y. Sch. Ins. Reciprocal*, 158 N.Y.S.3d 173, 177-78 (App. Div.

2021).

"New York law . . . does not recognize a separate cause of action for breach of the

implied covenant of good faith and fair dealing when a breach of contract claim, based upon the

same facts, is also pled."  *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir.

2002).  But New York courts do recognize that an insurance company's handling of a claim can give rise to both a breach of contract and a breach of the duty of good faith and fair dealing "where the conduct allegedly violating the implied covenant is not also the predicate for breach of an express provision of the contract." *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243-44 (S.D.N.Y. 1997); *see JJM Sunrise Auto., LLC v. Volkswagen Grp. of Am., Inc.*, 997 N.Y.S.2d 270, 287 (Sup. Ct. 2014) ("While some of the damages alleged in the claim for breach of the covenant of good faith and fair dealing may be 'intrinsically tied' to the damages resulting from the breach of contract claim, [plaintiff] alleges additional purportedly wrongful conduct during the parties' negotiation process that was not alleged as wrongful conduct constituting a breach of contract.  Therefore, while [plaintiff's] ninth cause of action and its breach of contract claims involve some overlap, they consist of distinct, non-duplicative independent claims.").  "A Plaintiff claiming a breach of the covenant of good faith and fair dealing must show:  (1) fraud, (2) malice, (3) bad faith, (4) other intentional wrongdoing, or (5) reckless indifference to the rights of others such as gross negligence." *Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 451 (S.D.N.Y. 2001).

Scottsdale argues that the breach of contract and good faith and fair dealing claims are duplicative because they are based on the same set of facts.  In its contract claim, Plaintiff alleges that Scottsdale "breached its obligations to Plaintiff under the Policy by failing and refusing to pay the full amount of Plaintiff's covered [l]oss."  (Compl. ¶ 36.)  In its good faith and fair dealing claim, Plaintiff similarly alleges that Scottsdale "acted in bad faith with respect to 232 Dune by and through its unreasonable, malicious, reckless or intentional failure and refusal to pay 232 Dune the benefits to which they are entitled under the Policy," (*id.* ¶ 44), including by denying benefits, (*id.* ¶ 45(a)), refusing to pay the loss, (*id.* ¶ 45(b)), intentionally delaying

payment owed, (*id.* ¶ 45(c)), failing to conduct proper investigation into claim, (*id.* ¶ 45(d)),

denying the claim within a day, (*id.* ¶ 45(e)), and relying on exclusion to avoid paying claim, (*id.*

¶ 45(g)).  The latter set of facts is duplicative of those supporting Plaintiff's breach of contract

claim.  *See, e.g.*, *Converse v. State Farm Fire & Cas. Co.*, No. 21-CV-457, 2022 WL 976891, at

*3 (N.D.N.Y. Mar. 31, 2022) (duplicative claims where facts underlying good faith and fair

dealing claim included allegations that plaintiffs suffered a loss that the insurance contract

covered and defendant denied their claim without reason); *Zarour v. Pac. Indem. Co.*, 113 F.

Supp. 3d 711, 716-17 (S.D.N.Y. 2015) (duplicative claims where facts underlying good faith and

fair dealing claim included allegations that defendant misrepresented policy coverage, refused to

adjust plaintiff's claim for coverage, and conducted "an outcome-oriented investigation").

       In its opposition brief, Plaintiff alleges that Scottsdale backdated the Policy to include the

HO3 form in an act of bad faith, and argues that this creates an independent cause of action that

does not rely on the same facts underlying the breach of contract claim.  (P's Scottsdale Opp. at

20.)  There are two problems with this argument.  First, it appears nowhere in the Complaint, and

a party may not introduce a new theory in opposition to a motion for summary judgment.  *See,*

*e.g., Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (affirming district court's

refusal to consider new theory of bad faith raised for first time in opposition to insurer's

summary judgment motion); *Saray Dokum ve Madeni Aksam Sanayi Turizm A.S. v. MTS*

*Logistics, Inc.*, No. 17-CV-7495, 2021 WL 1199470, at *7 (S.D.N.Y. Mar. 30, 2021) (collecting

cases); *Prescott v. Nationwide Mut. Ins. Co.*, No. 17-CV-6508, 2020 WL 64185, at *2 n.3

(E.D.N.Y. Jan. 7, 2020) ("It is settled law in this Circuit that it is inappropriate to raise new

factual allegations or legal theories for the first time in submissions in opposition to summary

judgment.").

Second, Plaintiff has failed to put forth evidence that Scottsdale's alleged "backdating" of the policy was a result of intentional wrongdoing or reckless indifference to Plaintiff's rights. Plaintiff provides no evidence disputing Scottsdale's evidence that the HO3 form was intended to be part of the Policy but was inadvertently omitted from Conklin's and Plaintiff's copy due to a printing error, (*see* McDonald Depo. at 66:20-67:19, 72:16-75:8; ECF No. 70-24 at SIC000222; *see* ECF No. 49-32 at SIC000395; ECF No. 70-27 at J&J000648-49), and as soon as it became clear to Scottsdale that the HO3 form was inadvertently omitted, (*see* ECF No. 70-27 at J&J000648-49 (Scottsdale employee asking, "Guys, were you guys aware of this error?" and another employee responding, "We did not know of this issue until today.")), its employees simply added it.  No reasonable jury could conclude that Scottsdale was "backdating" the Policy, as opposed to merely attaching a form that should have been included in the first place. Moreover, Plaintiff does not dispute that Scottsdale and J&J kept Plaintiff and Conklin fully and accurately apprised of what it was doing.  (ECF No. 70-14; ECF No. 70-13; *see also* Gaetano Depo. 166:21-22 (Scottsdale representative "told me there was some pages that I never received.").)  In light of this full disclosure, and in the absence of any evidence of intent to deceive or take unfair advantage, a reasonable jury could not conclude that Scottsdale's conduct constituted bad faith or unfair dealing.

Accordingly, Plaintiff's claim against Scottsdale for breach of the implied covenant of good faith and fair dealing fails.

### 4.    Declaratory Judgment

Plaintiff seeks an order declaring that Scottsdale is obligated to perform on its contractual obligations to Plaintiff under the Policy and that Plaintiff is entitled to coverage under the Policy for the full amount of the loss.  (Compl. ¶¶ 31-34).

Under the Declaratory Judgment Act, a court "may declare the rights and other legal relations of any interested party seeking such declaration" in "a case of actual controversy." 28 U.S.C. §2201(a). An "actual controversy" exists if there is a "substantial controversy, between parties having adverse legal interest, of sufficient immediacy and realty to warrant the issuance of a declaratory judgment." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005).

In granting Scottsdale's summary judgment motion as to the breach of contract claim, the Court has already determined that Scottsdale was not obligated to indemnify Plaintiff for the damages arising from the defective materials.

Accordingly, Plaintiff's declaratory judgment cause of action is dismissed.

### B.    Scottsdale's Reformation Counterclaim

Because the HO3 form was incorporated by reference in the Policy, I need not reach Scottsdale's counterclaim for reformation of the Policy to include it. (ECF No. 15 ¶¶ 12-16; *see* Scottsdale Mem. at 16-18.) But I will address it in the alternative and in an excess of caution. Plaintiff opposes the counterclaim, arguing that reformation based on mutual mistake is inapplicable because neither Plaintiff nor Quinn believed the omission of the HO3 form to be a mistake. (P's Scottsdale Opp. at 17-20.)

"[A] party seeking reformation of a contract must show, by clear and convincing evidence, either . . . [a] mutual mistake or . . . [a] fraudulently induced unilateral mistake." *Imrie v. Ratto*, 45 N.Y.S.3d 230 (App. Div. 2016); *see Healy v. Rich Prods. Corp.*, 981 F.2d 68, 73 (2d Cir. 1992) (party must overcome a "heavy presumption" that agreement "manifests the true intentions of the parties"). "A mutual mistake occurs when both parties to a bilateral transaction share the same erroneous belief and their acts do not in fact accomplish their mutual intent."

*Healy*, 981 F.2d at 73.  "Because the remedy of reformation presents the danger that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a different, oral contract, the New York courts have sharply limited the remedy of reformation both procedurally and substantively."  *Collins v. Harrison-Bode*, 303 F.3d 429, 435 (2d Cir. 2002).  "The proponent of reformation must 'show in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon between the parties.'"  *Id.* (quoting *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 574 (1986)).

"In contract law, a scrivener's error, like a mutual mistake, occurs when the intention of the parties is identical at the time of the transaction but the written agreement does not express that intention because of that error; this permits a court acting in equity to reform an agreement." *Washington v. NYC Med. Prac., P.C.*, No. 18-CV-9052, 2021 WL 918753, at *5 (S.D.N.Y. Mar. 10, 2021); *see Deutsch v. Pressler, Felt & Warshaw, LLP*, 535 F. Supp. 3d 322, 326 (S.D.N.Y. 2021) ("Under New York law, a court may 'equitably reform' a contract that contains a scrivener's error.").  "Where there is no mistake about the agreement and the only mistake alleged is in the reduction of that agreement to writing, such mistake of the scrivener, or of either party, no matter how it occurred, may be corrected."  *Washington*, 2021 WL 918753, at *5; *see U.S. Russ. Inv. Fund v. Neal & Co.,* No. 97-CV-1788, 1998 WL 557606, at *4 (S.D.N.Y. Sept. 2, 1998) ("Also referred to as 'scrivener's error,' mutual mistake occurs where the parties have reached a real and existing agreement on particular terms and subsequently find themselves bound to a writing which does not accurately express their agreement.").

Here, both Conklin and Scottsdale intended the Policy to be an HO3 policy, as demonstrated by the documentary evidence, including the Homeowner Application reviewed by Conklin, signed by Gaetano and submitted to Scottsdale's agent J&J, (*See* McDonald Depo. at

84:21-86:12, 89:11-92:7; Gaetano Depo. at 62:6-63:4, 139:8-12; Quinn Depo. at 25:10-13); the New Business Insurance Quote issued by J&J that indicated that "HO3" was the policy form, (ECF No. 49-15 at J&J000095); and the Policy that Scottsdale sent back to Conklin with its various references to the "HO3" policy form, (Policy at J&J000529-30, J&J000536, J&J000539, J&J000546, J&J000548-49, J&J000551), as well as the testimony, (Brown Depo. at 40:5-18; Moore Depo. at 61:6-17; McDonald Depo. at 77:9-15; Quinn Depo. at 75:23-76:9, 92:23-93:2, 99:13-15).  Given both parties' intentions that the Policy reflect HO3 coverage, the omission of the HO3 form from the Policy was a mutual mistake or scrivener's error.

Plaintiff's reliance on *Loyalty Life Insurance Co. v. Fredenberg*, 632 N.Y.S.2d 901 (App. Div. 1995), does not alter this conclusion.  Unlike here, *Loyalty Life* arose from a unilateral mistake by an agent of the insurer who erroneously told the insured it did not have to pay premiums, said so in writing, and then tried to take it back.  *Id.* at 297-99.  The court declined to reform the contract, finding that it was not a mutual mistake because the insured had no way of knowing that what the insurer said was not accurate.  *Id.* at 299.  Here, both parties intended for the HO3 form to be a part of the Policy and had either side reviewed the delivered Policy, they would have realized that it had been inadvertently omitted.  Likewise, it does not affect the outcome that Gaetano did not understand that the intended coverage was an HO3 policy because "[a]n insurance broker is an agent of the insured" and the insured is bound "by notice to or knowledge acquired by the agent."  *Ribacoff v. Chubb Grp. of Ins. Cos.*, 770 N.Y.S.2d 1, 2 (App. Div. 2003).  Conklin was clearly acting as Plaintiff's agent in procuring the Policy.  (*See* ECF No. 54-2 ¶¶ 2-4 (Plaintiff's statements, in response to requests to admit, that Conklin was Dune's

agent); Gaetano Depo. at 171:25-172:2 ("Gerard was my agent acting in my best interest.").)[11]

Plaintiff is "thus bound by their agent's understanding that insurance coverage . . . was . . .

intended to be" pursuant to an HO3 form. *Ribacoff*, 770 N.Y.S.2d at 2 (allowing reformation for

mutual mistake where insured's agent and insurer were in agreement about what policy was

supposed to contain).

      Thus, on the undisputed facts, reformation would be appropriate here if the HO3 form

were not incorporated into the Policy.

---

[11] Plaintiff's argument that Conklin was Scottsdale's agent, (P's 56.1 Conklin ¶ 3; P's Reply at 2-3), goes beyond disingenuous and into the realm of sanctionable. It is unsupported by any of the evidence it cites. (*See* Scottsdale 56.1 Resp. ¶ 3.) Specifically, Plaintiff cites to Conklin's licensing information, (ECF No. 70-25 at CONKLIN000194-96), which makes no reference to Scottsdale; the property loss notice Conklin submitted to Scottsdale on Plaintiff's behalf, (ECF No. 77-11), which does not in any way suggest that Conklin is Scottsdale's agent rather than Plaintiff's and which would make no sense if Conklin represented Scottsdale; paragraph 13 of Conklin's answer, (ECF No. 12), which Plaintiff represents as Conklin's admission to being Scottsdale's agent but which really says, in response to Plaintiff's allegation in the Complaint that Conklin was an agent acting on behalf of its principal in procuring the policy, that Conklin admits to assisting Plaintiff (not Scottsdale) in the purchase of the Policy; and a "Notice to Admit in which Defendant states Conklin is authorized to bind coverage under the Scottsdale Policy," but which is not supplied (that the Court could find) and (assuming it says that) hardly shows that Conklin was authorized to bind coverage on Scottsdale's behalf, as opposed to Plaintiff's. More disturbing than Plaintiff's distortion of the evidence it cites is its disregard of its own admissions. In Plaintiff's responses to Scottsdale's requests to admit, Plaintiff stated, among other things, "Conklin was Dune's agent on whom Dune relied to procure coverages related to 232 Dune Road Project"; "As Dune's agent, Conklin was authorized to communicate with J&J on Dune's behalf to procure insurance coverage for the 232 Dune Road Project"; and "As Dune's agent, Conklin was authorized to bind coverage under the Scottsdale policy *on Dune's behalf*." (ECF No. 54-2 ¶¶ 2-4 (emphasis added).) One wonders if the emphasized statement also appeared in the unsupplied Notice to Admit but was omitted from Plaintiff's description thereof. Beyond its responses to requests to admit, Gaetano stated in his deposition that Quinn, as his agent acting on his behalf, had the authority to bind Plaintiff the coverage set forth in the Scottsdale quote. (Gaetano Depo. at 171:175-172:2; *see id.* at 182:13-17 (Conklin was Plaintiff's agent).) Indeed, Plaintiff's Complaint describes Conklin and Quinn as insurance agents acting on behalf of their principal in "procuring" (not selling) the Policy and as brokers providing services to 232 Dune. (Compl. ¶¶ 13-16.) I do not see how an argument that Conklin and Quinn were Scottsdale's agents could have been made in good faith.

C.     **Claims Against Conklin**

Plaintiff brings claims against Conklin for breach of contract, negligence, and professional malpractice.  (Compl. ¶¶ 51-70.)  Plaintiff alleges that Conklin breached a contract by "failing to procure adequate insurance coverage for the 232 Dune Road ground up high end construction project including protecting the insured's interest from any loss to materials, fixtures and/or equipment," (*id.* ¶ 54), and breached their duties by "failing to, among other things:  (a) procure insurance which covered any loss resulting from defective building materials; (b) advise 232 Dune reasonably in the purchase of adequate insurance; and (c) procure coverage required by 232 Dune," (*id.* ¶ 60.)  Plaintiff further alleges that Conklin grossly departed from the standard of care of insurance agents and brokers in procuring the Policy.  (*Id.* ¶¶ 68-70.)

Conklin argues that summary judgment should be granted as to both the breach of contract and negligence claims because Plaintiff did not make a specific request for coverage and even if it had, the requested coverage was not available.  (ECF No. 53 ("Conklin Mem.") at 9-11.)  In its opposition, Plaintiff argues that it did make a specific request for "builders risk" coverage and whether that coverage was available is a question of fact to be determined at trial. (ECF No. 72 ("P's Conklin Opp.") at 13-16.)

1.     **Specific Request**

"Insurance agents have a common-law duty to obtain requested coverage for their clients within a reasonable time or inform the client of the inability to do so; however, they have no continuing duty to advise, guide or direct a client to obtain additional coverage."  *Am. Bldg. Supply Corp. v. Petrocelli Grp., Inc.*, 19 N.Y.3d 730, 735 (2012).  "To set forth a case for negligence or breach of contract against an insurance broker, a plaintiff must establish that a specific request was made to the broker for the coverage that was not provided in the policy."

31

*Id.*; *see Hoffend & Sons, Inc. v. Rose & Kiernan, Inc.*, 7 N.Y.3d 152, 155 (2006).  "A general

request for coverage will not satisfy the requirement of a specific request for a certain type of

coverage."  *Hoffend*, 7 N.Y.3d at 158; *see, e.g.*, *5 Awnings Plus, Inc. v. Moses Ins. Grp.*, 970

N.Y.S.2d 158, 160 (App. Div. 2013) (request for "best policy value" not a specific request for

coverage; *Catalanotto v. Com. Mut. Ins. Co.*, 729 N.Y.S.2d 199, 202 (App. Div. 2001) (no

specific request for coverage protecting against damage caused by the weight of snow or ice

where plaintiffs asked that defendant "cover [them] on everything"); *M&E Mfg. Co. v. Frank H.

Reis Inc.,* 692 N.Y.S.2d 191, 194 (App. Div. 1999) ("fully insured" not a specific request); *A&B

Furniture, Inc. v. Pitrock Realty Corp.*, 847 N.Y.S.2d 900, 900 (Sup. Ct. 2007) (no specific

request where plaintiff asked for "full coverage" but did not explain what he meant by "full

coverage" or ask whether he would be covered for particular kinds of events).  *But see Am. Bldg.

Supply Corp*, 19 N.Y.3d at 735-36 (fact issues exist as to special request for personal injury

claim where plaintiff testified that it requested "general liability for the employees if anybody

was to trip and fall or get injured in any way").

There is no dispute that Gaetano requested "builders risk" coverage, and there is no

dispute that the Policy (both versions) included a "Builders Risk Liability Coverage"

endorsement.  The issue before the Court is whether Gaetano's request for "builders risk"

coverage was a specific request for coverage of claims for defective materials.  Based on the

New York law cited above, it is not.  And it does not appear that Plaintiff is attempting to argue

otherwise – both Gaetano and Quinn testified that there was no discussion of such claims or

coverage, (Quinn Depo. at 27:14-24; Gaetano Depo. at 122:5-125:7) – but rather that Plaintiff is

arguing that through Quinn's communications with Gaetano about the project, Quinn was aware

of Plaintiff's need or desire for defective materials coverage, or at least that a question of fact

exists as to what Quinn knew.  (P's Conklin Opp. at 10).  Even if Quinn had such knowledge, he would only be required to act on it by suggesting defective material coverage to Plaintiff if they shared a special relationship which, as discussed below, they did not.  But the evidence does not even suggest that any of their communications would have put Quinn on notice that Plaintiff wanted coverage for defective materials used by subcontractors.

First, Gaetano testified that the only request he made to Quinn of the Policy was "for it to be a homeowner, builder risk policy with the type of structure being built.  And for a replacement value.  And for the . . . coverages included in a builders risk policy."  (Gaetano Depo. at 47:4-13.)  Second, none of the exhibits that Plaintiff cites as evidence discuss defective materials at all.  (P's Conklin Opp. at 10 (citing Exs. H, Q, R, S to the Feureisen Declaration (ECF Nos. 70-8, 70-17, 70-18, 70-19)).)  Exhibit H is an email to Quinn in which Gaetano requests a "policy to cover this piece of land" and provides specifics about the project with no information as to the use of contractors or subcontractors.  (ECF No. 70-8 at DUNE0000097.)  Exhibit Q is an internal Conklin email in which Quinn notes that the Gaetanos are seeking a homeowner's policy for the project and that "[e]verything will be subcontracted out with Certificates of Insurance (COI) being provided by the subcontractors."  (ECF No. 70-17 at CONKLIN000013.)  Exhibit R is an email between Quinn and Gaetano discussing the general terms of the insurance proposal, in which Gaetano notes that Plaintiff would act as the general contractor without any employees and that all its subcontractors "will have us as additionally insured for G[eneral] L[iability] and W[orkers'] C[ompensation]."  (ECF No. 70-18 at DUNE0000094.)  Exhibit S is a family of email chains and attachments, in which Gaetano and Quinn discuss workers' compensation for the subcontractors' employees, as required by the Village even though they are not Plaintiff's employees, (ECF No. 70-19 at DUNE0000099-100),

questions regarding progress on the flood insurance and "homeowners/builder policy," (*id.* at DUNE0000101-10), and the insurance proposal, (*id.* at DUNE0000111-126).  None of these exhibits indicate that Plaintiff was seeking coverage for defective materials, and if anything, Quinn's knowledge that the subcontractors would all add Plaintiff as an additional insured would make it even less reasonable for Quinn to infer from the correspondence that the requested policy should include coverage for defective materials used by subcontractors.[12]  Third, Plaintiff's

---

[12] Much of Plaintiff's position seems to be based on the mistaken impression that Quinn's awareness of Plaintiff's use of subcontractors equates to a specific request by Plaintiff for coverage for work and materials of subcontractors.  (*See, e.g.*, P's Conklin Opp. at 20 (arguing that Quinn admitted that Gaetano "specifically requested coverage for the work and materials by 232 Dune's subcontractors," by citing to Quinn's testimony that Quinn knew subcontractors would be doing the work).)  Plaintiff argues, and Conklin does not dispute, that Quinn knew that the work was being performed by subcontractors and that the project was "ground up" construction on vacant land.  (*Id.* at 10-11.)  This hardly suggests that Quinn understood that Plaintiff wanted defective materials coverage for the materials used by subcontractors who had their own insurance on which Plaintiff was named as an additional insured.

Plaintiff further contends that "Michael Gaetano testified that he relied upon Defendant Quinn's assurances [that] the proposal covered Plaintiff's request for coverage of 232 Dune for all of the subcontractors work."  (*Id*. at 11.)  In support Plaintiff cites to page 70 of Gaetano's deposition, which does not remotely address the subject, and to paragraph 16 of Gaetano's declaration, which likewise contains no reference to any such request or assurances.  The Court's review of Gaetano's deposition did not result in the identification of any support for Plaintiff's allegation.  The closest the parties came to discussing the issue during Gaetano's testimony was when he was asked whether he spoke with Quinn "about the possibility of obtaining coverage for faulty workmanship of contractors."  He did not answer the question yes or no, instead saying, "We talked about what coverage I needed and then to have the proper contracts in place and to also receive the insurance certifications from my . . . sub[contractors], what language would need to be included on those."  (Gaetano Depo. at 129:23-130:9.)  Gaetano's own description of his discussion with Quinn regarding the coverage Plaintiff needed did not include mention of Plaintiff obtaining coverage for defects introduced by subcontractors aside from Plaintiff being an additional insured on the subcontractors' policies.  That Gaetano and Quinn discussed the need to obtain the proper contracts and certificates of insurance from the subcontractors does nothing to suggest that Plaintiff asked for a policy that separately insured Plaintiff against defective materials used by or workmanship of subcontractors.

Plaintiff further argues that Gaetano "made clear to Defendant Quinn that the home was being built from the ground up and that 232 Dune, as owner and general contractor, needed coverage for all subcontractor's work."  (P's Conklin Opp. at 5-6.)  It cites no evidence for this

citations to Gaetano's declaration are similarly unhelpful; nowhere does he state that he requested coverage for defective materials.  (*See* Gaetano Decl. ¶¶ 8-11.)  Plaintiff has presented no evidence of communications that would suffice to put Quinn on notice that Plaintiff wanted a policy that covered claims for defective materials used by subcontractors.[13]  Further, for purposes of determining whether Plaintiff made a specific request, it is irrelevant if Gaetano subjectively expected that the Policy would cover all work to be performed by the subcontractors.  (*See* P's Conklin Opp. at 11; Gaetano Depo. at 131:20-132:23 (Gaetano discussing his subjective assumption that builders risk policy would cover cost to repair improperly performed subcontractor work).)[14]

_____

assertion, but in its brief in opposition to Scottsdale's motion, it cites paragraph 12 of Gaetano's declaration, (P's Scottsdale Opp. at 6), which says only that Gaetano told Quinn that all of the work was being subcontracted out by Plaintiff as general contractor, under American Institute of Architects contracts.  It says nothing about needing coverage for the work of the subcontractors.  Gross distortions of the record do not aid Plaintiff's case.

[13] Indeed, Conklin argues that the insurance Gaetano believed he was getting was not even available at the time the Policy was procured.  (Conklin Mem. at 11.).  Conklin's expert, Rick Hammond, opined that "there are no policies that would have provided coverage for the type of loss suffered by 232 Dune.  In fact, the subsequent and prior policies procured by 232 Dune contain the same exclusion as applicable in this case."  (ECF No. 52 at 14 (citations to page numbers refer to page numbers set by the ECF system).)  Quinn testified to the same.  (Quinn Depo. at 30:16-24.)  In opposition, Plaintiff relies on the Pfluger Report, in which he opines that "Homeowner's/Builders Risk insurance covering defective materials was available at the time this policy was issued in the United States insurance marketplace."  (Pfluger Rep. at 7.)  Plaintiff argues that this creates an issue of material fact precluding summary judgment.  Because I find that Plaintiff has failed to show that it made a specific request for coverage as a matter of law, I need not address the issue of whether the coverage was actually available at the time of the request.

[14] Plaintiff contends that "Michael Gaetano testified that he believed the insurance to be procured by Quinn would cover all work performed by 232 Dune's subcontractors," citing paragraph 9 of Gaetano's declaration.  (P's Conklin Opp. at 11.)  That paragraph says only that Quinn acknowledged that the project was the construction of a new single-family home of 7500 square feet at a cost of $3.5 million.  Plaintiff also argues that "Michael Gaetano, in reliance upon his communications with Defendant Quinn, expected that the builders risk/homeowners coverage detailed in the proposal procured by Defendant Quinn would cover all of the work

Accordingly, Plaintiff's breach of contract and negligence claims against Conklin fail.

### 2.    Special Relationship

Plaintiff argues that even if Gaetano did not make a specific request for coverage, Conklin had a duty to advise or direct Plaintiff to obtain coverage for defective materials because they had a special relationship.  (P's Conklin Opp. at 16-18.)

"Where a special relationship develops between the broker and client, . . . the broker may be liable, even in the absence of a specific request, for failing to advise or direct the client to obtain additional coverage."  *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 420 F. Supp. 3d 123, 136 (S.D.N.Y. 2019).  The New York Court of Appeals has identified "three exceptional situations that may give rise to a special relationship, thereby creating an additional duty of advisement," *Voss v. Neth. Ins. Co.*, 22 N.Y.3d 728, 735 (2014):

> (1) the agent receives compensation for consultation apart from payment of the premiums; (2) there was some interaction regarding a question of coverage, with the insured relying on the expertise of the agent; or (3) there is a course of dealing over an extended period of time which would have put objectively reasonable insurance agents on notice that their advice was being sought and specially relied on.

*Murphy v. Kuhn*, 90 N.Y.2d 266, 272 (1997); *see Cromer v. Rosenzweig Ins. Agency Inc.*, 68 N.Y.S.3d 169, 172-73 (App. Div. 2017) ("Whether such a special relationship exists is best determined on a case-by-case basis upon consideration of such factors as whether the broker received compensation for his or her consultation services distinct from the payment of premiums, whether the broker and the client had a specific interaction with respect to the

---

performed by its subcontractors, including the concrete foundation," citing paragraph 16 of Gaetano's declaration.  (*Id.* at 4.)  That paragraph says that neither Quinn nor anyone from his office ever told Gaetano that defective materials were not covered and that he expected that they would be.  It does not describe any communications with Quinn about the subject, let alone say that Gaetano relied on them.

insurance coverage such that it was apparent that the client was relying on the advice of the broker or whether there existed a course of dealing over an extended period of time that would have put an objectively reasonable insurance broker on notice that his or her advice and/or expertise were being relied upon."). Here, Plaintiff argues that a special relationship existed between Plaintiff and Conklin under both the second and third exceptions. (P's Scottsdale Opp. at 16-18.)

"To satisfy the second exceptional situation, courts have generally required that the insured make a specific request about the feature of the proposed insurance at issue in the subsequent suit." *Spinnato v. Unity of Omaha Life Ins. Co.*, 322 F. Supp. 3d 377, 393 (E.D.N.Y. 2018). Courts interpreting this exception typically look to *Voss* and *Murphy* to determine whether a special relationship was formed through an interaction regarding a question of coverage. *See e.g.*, *Pilkington N. Am., Inc.*, 420 F. Supp. 3d at 137; *Holborn Corp. v. Sawgrass Mut. Ins. Co.*, 304 F. Supp. 3d 392, 404 (S.D.N.Y. 2018). In *Voss*, the plaintiff asked the defendant whether an insurance policy with $75,000 in business interruption coverage would be sufficient, and the defendant "allegedly assured her that it would suffice." 985 N.Y.S.2d at 450. Relying on defendant's expertise, the plaintiff accepted the policy. *Id.* The Court of Appeals denied summary judgment, finding that a special relationship may have existed because the parties "discussed business interruption insurance from the inception of their business relationship," the defendant obtained "relevant data in order to calculate the proper level of coverage," and when the plaintiff questioned the $75,000 amount, the defendant "assured her that it was adequate based on his review of her business finances." *Id.* at 453. In *Murphy*, however, the Court of Appeals found no special relationship where the plaintiff "never asked [the defendant] to increase the liability limits" on the insurance policy at issue and, "[i]n fact,

there is no indication that [the plaintiff] ever inquired or discussed with [the defendant] any issues involving the liability limits" of the policy.  90 N.Y.2d 266, 271.  "Such lack of initiative or personal indifference cannot qualify as legally recognizable or justifiable reliance." *Id.*

This case is like *Murphy* and bears no resemblance to *Voss*.  Plaintiff alleges that "there is an abundance of evidence as to the detailed interaction and communication between Michael Gaetano and Quinn here on the question of coverage in this case," (P's Conklin Opp. at 17), but as established above, Gaetano did not raise the question of whether the policy would cover defective materials claims – or really any question of coverage governing subcontractors.  That Gaetano believed he was covered for the defective damages claim based on the Policy, without reliance on specific statements made by Quinn, is insufficient to sustain the second exception. *See Tracey Rd. Equip., Inc. v. Ally Fin., Inc.*, No. 18-CV-0011, 2018 WL 1578160, at *3 (N.D.N.Y. Mar. 29, 2018) ("Plaintiff alleges that it reasonably and justifiably believed that Defendant's assurance that it was adequately and appropriately insured meant that it was insured against damages resulting from credit card fraud.  However, a general conversation about 'adequate' insurance – regardless of what Plaintiff believed – was not a request for credit card fraud insurance and did not impose upon Defendant a duty of advisement.").  In short, Plaintiff got the homeowners/builders risk policy it requested, and any erroneous assumption on Gaetano's part that it would cover defective subcontractor materials cannot be ascribed to Quinn or Conklin.

The third exceptional situation is typically only found when there is a "longstanding relationship, the client is relatively unsophisticated, and the broker exercises significant decision-making control over the procurement of insurance."  *Id.* at *4; *see Finch v. Steve Cardell Agency*, 25 N.Y.S.3d 441, 443 (App. Div. 2016) (triable issue of fact as to whether special relationship

38

existed where client of at least six years "knew little about insurance," never reviewed any of the insurance policies that the broker procured, and "insurance certificates were the only documents ever provided to him"); *S. Bay Cardiovascular Assocs., P.C. v. SCS Agency, Inc.*, 963 N.Y.S.2d 688, 691 (App. Div. 2013) (triable issue of fact as to whether special relationship existed where client of five years did not read insurance policies and broker told her that it "did not expect her to read the insurance policies"). But "courts have rejected course of dealing claims where the claim is premised solely on the existence of a long-standing relationship between the client and insurance broker." *Tracey Rd. Equip.*, 2018 WL 1578160, at *4; *see Spinnato*, 322 F. Supp. 3d at 394 ("[A] claim that is based predominantly on a longstanding client relationship is insufficient."). Further, "[a]ll insurance customers are seeking the most advantageous insurance policy, and as a result, a discussion generally about what policy will be the most advantageous does not suggest that the Plaintiff enjoyed anything other than an ordinary consumer-agent insurance relationship." *Holborn Corp.*, 304 F. Supp. 3d at 405.

Plaintiff argues that it maintained a "course of dealings on insurance coverage matters with Mr. Quinn since 2012." (P's Conklin Opp. at 17.) But Plaintiffs fail to allege anything beyond the existence of an eight-year relationship, which is insufficient to sustain the second exception. *See Tracey Rd. Equip.*, 2018 WL 1578160, at *4.[15] Indeed, Plaintiff engaged in only three transactions – in 2012, 2016, and 2020 – over eight years. "This lack of a long-standing,

---

[15] I disregard the parties' experts' opinions on whether a special relationship existed. Those opinions are legal conclusions, and the experts purport to be experts in insurance, not the law. Further, experts may not opine on legal conclusions. *H. Daya Int'l Co. v. Do Denim, LLC*, No. 16-CV 8668, 2023 WL 1340422, at *2 (S.D.N.Y. Jan. 31, 2023) ("[A]n expert may not give testimony stating ultimate legal conclusions or otherwise usurp the role of the trial judge or the jury in its fact-finding mission."). In addition, Pfluger provides no facts supporting his conclusory opinion. *See Fletcher v. City of New London*, No. 16-CV-241, 2018 WL 4604306, at *7 n.6 (D. Conn. Sept. 25, 2018) (expert opinion excluded as legal conclusion and *ipse dixit*).

continuous relationship is suggestive of a typical insurance broker relationship, rather than the special relationship" that Plaintiff claims.  *Spinnato*, 322 F. Supp. 3d at 394.  Gaetano's allegation in his declaration – that "[b]eginning in 2012, my father and I formed a special business relationship with Defendant Gerard Quinn.  We had come to rely on Gerard Quinn to provide expertise and advice on insurance coverage needed for our various projects," (Gaetano Decl. ¶ 6) – is wholly conclusory.  He describes nothing about the prior dealings that would suggest his or his father's own lack of sophistication, evidence Quinn's control over their insurance decisions, or otherwise elevate an ordinary business relationship into a special one.  Indeed, that "formulaic recitation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), would not even suffice to state a claim at the motion to dismiss stage, *see Gregory v. Daly*, 243 F.3d 687, 692 (2d Cir. 2001), *as amended* (Apr. 20, 2001) ("simple declaration" that conduct meets legal standard does not suffice to state plausible claim), let alone constitute evidence sufficient to defeat summary judgment.  Plaintiff acknowledges that a finding of a special relationship based on course of dealing requires "evidentiary submissions," (P's Conklin Opp. at 24 (quoting *Axis Constr. Corp. v. O'Brien Agency, Inc.*, 929 N.Y.S.2d 869, 869 (App. Div. 2011))), but provides no such evidence.  A factfinder concluding that the relationship here ripened into a special one would be engaging in sheer speculation.

Accordingly, Plaintiff's claims against Conklin fail.

## IV.    **CONCLUSION**

For the foregoing reasons, Defendant Scottsdale's motion is GRANTED, Defendant Conklin's motion is GRANTED, and Plaintiff's cross-motion is DENIED.  The Clerk of Court is

respectfully directed to terminate the pending motions, (ECF Nos. 48, 50, 62), enter judgment for

Defendants, and close the case.

**SO ORDERED.**

Dated: February 13, 2023
      White Plains, New York

_____
         CATHY SEIBEL, U.S.D.J.